**MOUNT VERNON FIRE INSURANCE COMPANY, Plaintiff,**

v.

**EAST SIDE RENAISSANCE ASSOCIATES, Howard J. Buck, Edward Keneys Goethe, Frank Moretti, Paul Balme, Achilles Perry a/k/a Anchilles Perry, Steve Satterwhite, Kirshop Realty Corp., K.N. Realty Development Corp., Noho Properties Inc., Danmor Realty Corp., P.H. Basic Partners and Charles Pichardo and David Pichardo, infants by their mother Juana Pichardo and Juana Pichardo, individually, Defendants.**

**No. 92 Civ. 7138(SAS).**

United States District Court, S.D. New York.

June 15, 1995.

---

Barry Jacobs, Thurm & Heller, L.L.P., New York City, for plaintiff Mount Vernon Fire Ins. Co.

Michael H. Kane, New York City, for defendants East Side Renaissance Associates, Howard J. Buck, Edward Keneys Goethe, Frank Moretti, K.N. Realty Development Corp. and Noho Properties.

Alan Kestenbaum and Weil & Kestenbaum, Bayside, NY, for defendants Charles Pichardo, David Pichardo and Juana Pichardo.

Chesney, Murphy & Moran, Westbury, NY, for defendant Danmor Realty Corp.

*OPINION AND ORDER*

SCHEINDLIN, District Judge:

## I. INTRODUCTION

Plaintiff, Mount Vernon Fire Insurance Company ("Mt. Vernon"), seeks a declaratory judgment that it is not obligated to defend or indemnify its insured East Side Renaissance, Ltd. ("East Side") in a personal injury action brought against East Side by Juana, David and Charles Pichardo (the "Pichardos"). Mt. Vernon contends it has no obligation to defend or indemnify East Side because East Side failed to give Mt. Vernon notice of an "occurrence" as soon as practicable as required by its insurance policy. East Side asserts that the notice it gave to Mt. Vernon almost eight (8) years after the oc-

currence was timely because commencement of the Pichardos' action was the first time it was aware of any claim against it.

A one day bench trial was held on May 12, 1995. At the close of the evidence, the Court found in favor of Mt. Vernon with respect to any claim regarding injury to David Pichardo.[1] The Court reserved decision with respect to the claims made by Juana and Charles Pichardo.

## II. FACTUAL BACKGROUND

The following facts are undisputed. East Side Renaissance Associates, a New York limited partnership, owned the premises located at 42 Rivington Street (the "Premises") during the period May 1984 through May 1986. *See* Joint Pre–Trial Order at 4. Edward Keneys Goethe ("Goethe"), a general partner in East Side, managed the Premises from May 1984 until August 9, 1985, when he and individual defendants Howard J. Buck ("Buck"), Frank Moretti ("Moretti"), and K.N. Realty Development Corp. ("K.N.") sold their interests in East Side to a group of individuals which included defendants Paul Balme ("Balme"), Achilles Perry ("Perry") and Steve Satterwhite ("Satterwhite").[2] *Id.* at pp. 4–5.

Mt. Vernon issued two insurance policies which provided comprehensive general liability insurance for the Premises. The first policy was issued to "East Side Renaissance, Ltd. c/o Michael Kane" and covered the period May 2, 1984 to May 2, 1985. *Id.* at pp. 3–4. The second policy was issued to "East Side Renaissance, a limited partnership c/o NoHo Properties" and covered the period May 2, 1985 to May 2, 1986. *Id.* at 4.

Both policies were "occurrence-based" policies requiring that East Side notify Mt. Vernon of an occurrence "as soon as practicable."[3] *See* Plaintiff's Exhibits 5 and 6. The policies defined "occurrence" to mean an "accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* The provision requiring notice stated:

Insured's Duties in the Event of Occurrence, Claim or Suit:

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place, and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents *as soon as practicable.*

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

*Id.* (emphasis added).

At trial, Astor Manderson ("Manderson"), a Public Health sanitarian employed by the New York City Health Department, Bureau of Lead Poisoning, testified that on June 27, 1984, he first inspected the Pichardos' apartment (the "Apartment") at 42 Rivington Street.[4] *See* Trial Transcript ("TR.") at pp. 17–19; *see also* Joint Pre–Trial Order at 6; Plaintiff's Exhibit 3. An "Order to Landlord/Agent" dated July 2, 1984 (the "Order"), was subsequently mailed to Goethe advising

---

**1.** David Pichardo was born on June 1, 1990. The second Mt. Vernon policy, an "occurrence-based" policy, expired on May 2, 1986. The first policy, also "occurrence-based," expired a year earlier. Because David was not born until after the expiration of the second policy, there could not have been an occurrence with respect to David Pichardo during either policy period.

**2.** Buck, Moretti, and K.N. were also partners in East Side.

**3.** An "occurrence-based" policy covers injuries that occur during the policy period regardless of whether the loss is reported during that period.

A "claims-made" policy covers liability for bodily injury or property damage only if a claim is asserted during the policy period. Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 4.02[b][4] (7th ed.1994).

**4.** The job duties and responsibilities of a Public Health sanitarian include performing field inspections at addresses where a child has been diagnosed with elevated lead levels to determine whether there was lead paint in the apartment. *See* Trial Transcript ("TR.") at p. 14.

him that a person residing in the Pichardo apartment was found to have a "blood-lead level of thirty (30) micrograms per deciliter, or higher." *Id.; see also* Plaintiff's Exhibit 3A. The Order additionally stated that as a result of the June 27 inspection, it was found that there was paint on the interior surfaces of the Apartment which contained at least 0.7 milligrams of lead per square centimeter of surface "and/or more than 0.5% of metallic lead based paint in the non-volatile content of the paint resulting in violation of the New York City Health Code Section 173.13:(d)(2)." *See* Plaintiff's Exhibit 3A; *see also* Joint Pre–Trial Order at 6. The parties agree that neither Goethe, who was the managing agent of the Premises at the time, nor East Side notified Mt. Vernon of the Order.[5]

Apparently as a result of receiving the Order, Goethe caused certain repairs to be done on the Apartment. The Apartment was re-inspected on July 26, 1984, at which time the repairs were still in progress. *See* TR. at p. 20. On September 4, 1984, the date of the next inspection, repair work appeared to be continuing but the tenant stated that no work had been done in the Apartment since August 3, 1984. *Id.* at 21. At this point, the case was referred to the New York City Emergency Repair Program because approximately six (6) weeks had passed since the initial inspection of June 27 and the repairs had not been completed. *Id.* Because total compliance had still not been achieved by October 25, 1984, Goethe was requested to appear for a tribunal hearing. *Id.* at pp. 26–27. Following the hearing, another re-inspection was performed on December 21, 1984, which showed that no additional repair work had been done in the Apartment. *Id.* at 33. This caused the matter to be referred, once again, to the Emergency Repair Program. *Id.* at pp. 33–34. The next re-inspection took place on January 8, 1985, at which time repair work was being performed. *Id.* at 36. Two more inspections took place, the first on January 25, 1985 and the second on April 8, 1985. During the April 8 inspection

it was determined that all the violations had been removed. *Id.* at 37.

On or about April 29, 1992, the Pichardos commenced a personal injury action against East Side and others in New York County Supreme Court for damages resulting from David and Charles Pichardo's prolonged exposure to lead dust particles and lead-based paint.[6] *See* Joint Pre–Trial Order at 7; Plaintiff's Exhibit E. East Side notified Mt. Vernon of the Pichardos' claims by forwarding both the summons and complaint on the very day it was served. *See* Joint Pre–Trial Order at 7. By letter dated October 7, 1992, Mt. Vernon disclaimed coverage for the Pichardos' claims asserting that East Side violated the insurance contract by failing to provide notice of the occurrence "as soon as practicable." *See* Plaintiff's Exhibit 8. Specifically, Mt. Vernon asserted that East Side was aware of an "occurrence" when it received the Order in 1984 yet failed to notify Mt. Vernon until April 29, 1992, the date East Side received the Pichardos' Summons and Complaint. *Id.*

### III.  DISCUSSION

#### A.  *Receipt of the Order by Goethe*

 There is a rebuttable presumption that a letter which is mailed is received by the addressee. *See Meckel v. Continental Resources Co.,* 758 F.2d 811, 817 (2d Cir. 1985); *Nassau Insurance Co. v. Murray,* 46 N.Y.2d 828, 829, 414 N.Y.S.2d 117, 386 N.E.2d 1085 (1978); *Bronia Inc. v. Ho,* 873 F.Supp. 854, 859 (S.D.N.Y.1995). Under New York law, however, the presumption arises only when there is proof of mailing. *Meckel,* 758 F.2d at 817; *Bronia Inc.,* 873 F.Supp. at 859. Proof of mailing may be established either by offering testimony of the person who actually mailed the letter or by showing that it was the regular office practice and procedure to mail such a letter. *Meckel,* 758 F.2d at 817; *Nassau Insurance Co.,* 46 N.Y.2d at 829, 414 N.Y.S.2d 117, 386 N.E.2d 1085; *Bronia Inc.,* 873 F.Supp. at

---

5.  Goethe died in February, 1994.

6.  Other named defendants in the Pichardos' state action include Kirshop Realty Corp., Howard J. Buck, Paul Balme, Achilles Perry, a/k/a Anchilles Perry, P.H. Basic Partners, Edward Keneys Goethe, K.N. Realty Development Corp., Frank Moretti and Steve Satterwhite. *See* Plaintiff's Exhibit E.

859. Under New York law, personal knowledge of the mailing is not required for the presumption to arise so long as there is testimony from someone with personal knowledge which establishes regular office procedure. *Meckel,* 758 F.2d at 817; *Nassau Insurance Co.,* 46 N.Y.2d at 829, 414 N.Y.S.2d 117, 386 N.E.2d 1085; *Bronia Inc.,* 873 F.Supp. at 859.

■ Defendants contend that Mt. Vernon offers no proof that Goethe ever received the Order sent by the Department of Health. As a result, defendants argue, there is no proof that East Side had notice of an occurrence in 1984. Mt. Vernon contends that the court must presume that Goethe received the Order and that defendants have failed to rebut that presumption.

At trial, Manderson testified that he completed and signed reports concerning his inspection of the Pichardos' apartment on June 27, 1984. *See* TR. at pp. 17–19. Manderson further testified that it was the custom and practice in 1984 for these reports to be reviewed and given to the clerical staff, who would then notify the managing agent by mailing an Order to the landlord/agent, of the type at issue here. *Id.* at pp. 18–19.

In addition, Martin Kimmelblatt ("Kimmelblatt"), who was also employed as a Public Health sanitarian by the New York City Health Department, Bureau of Lead Poisoning Control, testified that in 1984, if an inspection revealed elevated lead levels in the premises, it was the custom and practice of the Bureau of Lead Poisoning to prepare and mail the managing agent a letter describing the violations.[7] *See* TR. at p. 49. Kimmelblatt further testified that the Order allegedly mailed to Goethe was the form usually sent by the Bureau of Lead Poisoning to the managing agent following an inspection which showed elevated lead levels. *Id.*

■ As Public Health sanitarians at the time the Order was allegedly mailed, both Manderson and Kimmelblatt had personal knowledge of the regular office practice and procedure. Both testified that it was the regular procedure to inform the managing agent of the violations by mailing a letter similar to the Order at issue here. *See* TR. at pp. 19, 49. As employees with personal knowledge of office practice, this testimony establishes that it was regular office procedure to mail such orders to the managing agent. This testimony is sufficient to establish proof of mailing of the Order to Goethe. *See Meckel,* 758 F.2d at 817; *Nassau Insurance Co.,* 46 N.Y.2d at 829, 414 N.Y.S.2d 117, 386 N.E.2d 1085; *Bronia Inc.,* 873 F.Supp. at 859. Because there is proof of mailing to Goethe, the rebuttable presumption arises that Goethe received the Order. *See Meckel,* 758 F.2d at 817; *Nassau Insurance Co.,* 46 N.Y.2d at 829, 414 N.Y.S.2d 117, 386 N.E.2d 1085; *Bronia Inc.,* 873 F.Supp. at 859. Defendants have offered no evidence to rebut this presumption and denial of receipt, "standing alone, is insufficient to rebut the presumption." *Nassau Insurance Co.,* 46 N.Y.2d at 830, 414 N.Y.S.2d 117, 386 N.E.2d 1085.

In addition to the presumption, the circumstantial evidence supports the finding that the Order was mailed and received in 1984. The evidence to which I refer is Manderson's testimony concerning his repeated inspections. His first visit resulted in the mailing of the Order. On his next inspection, *after* the Order was mailed, repair work was in progress. Such work continued over a period of time as revealed by subsequent inspections. Finally, the violations were twice referred to the Emergency Repair Board and the owner was summoned to a tribunal hearing. Plaintiff has demonstrated, by a preponderance of the evidence, that the July 2, 1984 Order was received by defendant-owner East Side.

### B. *Notice to the Partnership*

■ Under N.Y. Partnership Law § 23 (McKinney 1988),

Notice to any partner of any matter relating to partnership affairs, and the knowledge of the partner acting in the particular matter, acquired while a partner or then

---

7. At trial, Kimmelblatt testified that these Orders were usually sent to the managing agent by certified mail. *See* TR. at 50. No certified mail

receipt was found in the Health Department file with respect to this premises. *Id.* at 53.

present to his mind, and the knowledge of any other partner who reasonably could and should have communicated it to the acting partner, operate as notice to or knowledge of the partnership, except in the case of a fraud on the partnership committed by or with the consent of that partner.

Furthermore, pursuant to N.Y. Partnership Law § 20(1) (McKinney 1988),

Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

Mt. Vernon contends that Goethe's receipt of the Order, which is presumed, placed him on notice of an "occurrence" as defined in the Mt. Vernon policy. Plaintiff further asserts that the notice Goethe had is imputed to the partnership, triggering the partnership's obligation to notify Mt. Vernon of the occurrence.

East Side, a New York limited partnership, owned the building at 42 Rivington Street from May 1984 through May 1986. Goethe was a general partner in East Side until August 9, 1985 and was managing agent of the Premises from May 1984 until August 9, 1985. Any matter relating to an apartment in the 42 Rivington Street building naturally related to the partnership affairs of East Side. *See generally Bank of Commerce v. De Santis,* 114 Misc.2d 491, 451 N.Y.S.2d 974, 977 (Civ.Ct.N.Y.Co.1982). Because Goethe, a general partner in East Side, is presumed to have received the Order and the Order relates to partnership matters, East Side is deemed to have notice of the Order pursuant to N.Y. Partnership Law § 23 (McKinney 1988). The issue still remains, however, whether the Order constituted notice of an "occurrence" under the policy.

## C. Notice to Mt. Vernon

An insured's compliance with a notice of occurrence provision is a condition precedent to an insurer's liability. *Commercial Union Ins. Co. v. International Flavors and Fragrances, Inc.,* 822 F.2d 267, 271 (2d Cir1987); *White v. City of New York,* 81 N.Y.2d 955, 957, 598 N.Y.S.2d 759, 615 N.E.2d 216 (1993); *Security Mutual Ins. Co. of New York v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 441, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972). Whether the notice given to Mt. Vernon by East Side was timely under the policy depends upon whether Goethe's receipt of the Order triggered East Side's obligation to notify Mt. Vernon.

### 1. An Insured's Obligation to Notify Its Insurer

Whether an insured is required to give notice to an insurer of an "occurrence" depends on the particular facts and circumstances underlying the occurrence. *See D'Aloia v. Travelers Insurance Co.,* 85 N.Y.2d 825, 623 N.Y.S.2d 837, 647 N.E.2d 1345 (1995); *Merchants Mutual Insurance Co. v. Hoffman,* 56 N.Y.2d 799, 452 N.Y.S.2d 398, 437 N.E.2d 1155 (1982); *Security Mutual,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76; *875 Forest Ave. Corp. v. Aetna Casualty and Surety Co.,* 30 N.Y.2d 726, 332 N.Y.S.2d 896, 283 N.E.2d 768 (1972). If the facts of an occurrence "are such that an insured acting in good faith would not reasonably believe that liability will result," *D'Aloia,* 85 N.Y.2d at 826, 623 N.Y.S.2d 837, 647 N.E.2d 1345, the insured's obligation to notify its insurer does not arise until it "receives notice that a claim will in fact be made." *Id.* An insurance policy notice provision is triggered only if "the circumstances known to the insured at the time would have suggested to a reasonable person the possibility of a claim." *Commercial Union,* 822 F.2d at 272.

In determining whether the insured's belief was reasonable, it may be relevant whether and to what extent, the insured inquired into the circumstances of the occurrence. *Security Mutual,* 31 N.Y.2d at 441, 340 N.Y.S.2d 902, 293 N.E.2d 76; *Utica Mu-*

*tual Insurance Co. v. C.L. Haines Manufacturing Co., Inc.,* 55 A.D.2d 834, 390 N.Y.S.2d 320, 322 (4th Dep't 1976). If the circumstances of an occurrence known to the insured would have caused a reasonable and prudent person to further investigate the occurrence, the insured may not later assert a reasonable belief of nonliability as an excuse for untimely notice to an insurance carrier. *Security Mutual,* 31 N.Y.2d at 443, 340 N.Y.S.2d 902, 293 N.E.2d 76.

East Side contends that there was nothing in the Order which notified it of potential liability to the Pichardos. It further argues that, under the circumstances, a reasonable building owner acting in good faith would not believe the Order placed it on notice of the possibility of a lawsuit.

### 2. *East Side's Knowledge of the Occurrence*

Goethe had no personal contact with either the victim's mother or grandmother, both tenants of the Apartment, concerning Charles Pichardo's injuries.[8] In addition, there is no evidence to demonstrate that the victim's family ever spoke to the general manager of East Side or any of its partners concerning the alleged injuries.[9] Goethe's sole source of information concerning Charles' injuries was the Order. Therefore, in order for the notice provision of the policy to be triggered, the Order alone must have been sufficient to suggest the possibility of a lawsuit.

The policy defines an occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage." The Order received by Goethe uses technical language in describing both the tenant's blood-lead level and the lead level of the paint.[10] *See* Plaintiff's Exhibit 3A. In addition, the Order never states that the blood-lead level of the tenant is due to "exposure to conditions" in the Apartment or that possible danger to a tenant exists. *Id.* Rather, it states that "it has been found that a person residing at the above dwelling unit has a blood-lead level of 30 micrograms per deciliter . . ." Moreover, the Order did not indicate that it was a child that was affected and also failed to definitively establish who the affected person was. At the top of the Order, the name Charles Pichardo appeared in a space designated for "TENANT."

Furthermore, East Side purchased the Premises in May 1984, just two months before Goethe received the Order. As the Order identified a person with elevated blood levels, the tests were undoubtedly performed sometime prior to the notice. Under the circumstances, it may have been reasonable for East Side to conclude that while it might have been obligated to repair the apartment,

---

**8.** Juana Pichardo, Charles' mother, was asked at her deposition if "at any time from January of 1983 and after did you personally tell anyone about the conditions in the apartment as they were described by you besides Anna [your mother-in-law]?" Juana Pichardo answered "No." Deposition of Juana Pichardo, February 24, 1995 at p. 31. When asked "During that same time period, January of 1983 through June 27, 1984, did you personally contact anyone aside from Anna to tell them about the conditions of the apartment?" Juana Pichardo again answered "No." *Id.* at 31–32.

In addition, Anna Pichardo, who was also a tenant of the Pichardo apartment, testified at deposition that Goethe was never personally notified of any injury due to lead based paint. When asked if she contacted the landlord about the condition of the apartment after Charles was taken to the hospital, Anna answered "No, then they sent exactly, they sent—they sent someone to fix it, from like somewhere." Deposition of Anna Pichardo, March 23, 1995 at p. 31. When asked if she personally had called or wrote to

anybody about the condition of the Apartment in 1984, Anna answered "No." *Id.* at 44.

**9.** Buck, a defendant and general partner in East Side, testified at trial that Goethe never notified him that any tenant suffered from lead poisoning. *See* TR. at p. 99. While Goethe's receipt of the Order is imputed to Buck as a partner in East Side, this testimony helps to establish that Buck never personally spoke to or received notice from Juana or Anna Pichardo regarding any injuries.

**10.** The Order stated that "a tenant" of the Apartment had a "blood-lead level of 30 micrograms per deciliter, or higher, with a free erythrocyte porphyrin (FEP) of 5 micrograms per deciliter." *See* Plaintiff's Exhibit 3A. The Order also informed Goethe that paint was found on interior surfaces of the Apartment which contained "0.7 milligrams of lead per square centimeter of surface or greater and/or more than 0.5% of metallic lead based paint in the non-volatile content of the paint." *See id.*

it was not responsible for causing injury to the person with elevated blood levels.[11]

### 3. East Side Had No Notice of Potential Liability

For the foregoing reasons, I find that receipt of this Order in July, 1984, would not place a reasonable owner/landlord, acting in good faith, on notice that a tenant had suffered bodily injury and that it might be sued as a result of such injury. *See generally Commercial Union,* 822 F.2d 267; *D'Aloia,* 85 N.Y.2d 825, 623 N.Y.S.2d 837, 647 N.E.2d 1345; *Merchants Mutual,* 56 N.Y.2d 799, 452 N.Y.S.2d 398, 437 N.E.2d 1155; *Security Mutual,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76; *875 Forest Ave. Corp.,* 30 N.Y.2d 726, 332 N.Y.S.2d 896, 283 N.E.2d 768. Further, I find that receipt of the Order would not have caused a reasonable and prudent owner to further investigate.[12] Indeed, if receipt of an "Order to Landlord/Agent" to remove lead from an apartment, without more, was sufficient notice of a personal injury claim, then thousands of landlords in New York have likely failed to provide timely notice of claims to their insurers, thereby effectively depriving owners of coverage and plaintiffs of a reliable deep pocket.

No one factor definitively establishes that it was reasonable for Goethe to conclude that East Side had no liability for an "occurrence" when he received the Order. The following factors, in combination, however, would lead a reasonable person to that conclusion: (a) the Order did not definitively identify the injured party; (b) the victims never notified East Side of any injury or claim; and (c) East Side had only owned the building for two months when it received the Order.[13]

Plaintiff cites *Mount Vernon Fire Insurance, Co. v. Arec Bros., Corp.,* No. 91 Civ. 708 (E.D.N.Y. Jan. 19, 1995), as authority for the proposition that Goethe should have realized when he received the Order that liability would result. In *Arec,* the Court ruled that defendant had breached the insurance policy by failing to give notice of an occurrence as soon as practicable.

While *Arec* addresses the same legal issues as those raised here, the facts are quite different. There, the managing agent had a conversation with the victim's mother informing him that her child had been hospitalized due to lead poisoning. This conversation occurred at or about the same time that the City sent a notice that the *same* child had elevated blood levels. The Order received by the managing agent in *Arec* was more explicit than the instant Order. It stated that the conditions of the apartment "present a danger to the life or health of the *child/children* of the above-referenced premises." No such warning was sent to East Side.

Because the Order at issue here does not suggest the possibility of a lawsuit, East Side's obligation to notify Mt. Vernon was not triggered until Goethe received the Pichardos' Summons and Complaint in April 1992. East Side provided Mt. Vernon with timely notice of the Summons and Complaint by forwarding both documents to Mt. Vernon the same day East Side received them. Be-

---

**11.** The Appellate Division, First Department recently gave similar consideration to the liability of a recent purchaser of a building with lead violations in *Juarez v. Wavecrest Management Team Ltd.,* 212 A.D.2d 38, 627 N.Y.S.2d 620 (1st Dep't 1995). There, the Court overturned a grant of summary judgment to plaintiffs against the managing agent and successor owner of the building, holding that an issue of fact existed as to whether the successor owner had allowed the lead paint violations to exist after it acquired the building.

**12.** The facts of this case are quite different from those in which the Court found a duty to investigate. *See Security Mutual,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76 (finding a duty for building owner to investigate where a news arti-

cle made owner aware of fire and injuries to firemen in his building and the article specifically mentioned owner's possible liability); *Utica Mutual,* 390 N.Y.S.2d 320 (receiving information from employee regarding two distinct accidents involving manufacturer's machinery required manufacturer to further investigate and evaluate its potential liability).

**13.** Buck's testimony provides additional support for finding that the Order would not have put an insured, acting in good faith, on notice of a claim. Buck, who has owned and managed multifamily properties in New York City since 1974, testified that he would not have notified his insurance carrier upon receiving the Order and would not do so if he received such an Order today. *See* TR. at pp. *91–92, 105.*

cause East Side complied with the terms of the policy, Mt. Vernon is required to defend and indemnify East Side in the actions brought against it by Juana and Charles Pichardo.[14]

## IV. CONCLUSION

For the reasons set forth above, plaintiff's request for a declaration that it is not obligated to defend and indemnify East Side with regard to the personal injury claim asserted by the Pichardos is denied. Accordingly, Mt. Vernon is required to defend and indemnify East Side with respect to the underlying claim.

SO ORDERED.

---

14. Defendants assert that even if timely notice of the occurrence and claim had not been given, plaintiff would still be estopped from disclaiming liability because notice of the disclaimer was untimely. This argument is specious because Mt. Vernon could not disclaim liability until it knew of the existence of the Order. Deane Paladino, a claims investigator for J & A Investigation Services and Mt. Vernon, testified that there was no other way for Mt. Vernon to know that East Side was placed on notice of Health Code violations other than by obtaining the records from the Bureau of Lead Poisoning. *See* TR. at 58. According to Ms. Paladino, this required Mt. Vernon to obtain an authorization from one of the building's owners. *Id.* at 57.