**MOUNT VERNON FIRE INSURANCE COMPANY, Plaintiff,**

v.

**ABESOL REALTY CORP., Estate of Bencion Neiss, Neiss Management, Catalina Griffith Co., Anthony Thompson and Guiliano Thompson, Defendants.**

No. 00–CV–3864(ILG).

United States District Court, E.D. New York.

Oct. 15, 2003.

Brian S. Sokoloff, Esq., Miranda & Sokoloff, L.L.P., Mineola, NY, for Plaintiff.

Deborah A. Bass, Esq., Ledy–Gurren & Blumenstock, L.L.P., New York City, Martin H. Minsky, Esq., Kerpelman & Associates, Bronx, NY, for Defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

### I. INTRODUCTION

Plaintiff Mount Vernon Fire Insurance Company ("Plaintiff" or "Mount Vernon") seeks summary judgment on its action for an order declaring that it does not have a duty to defend or indemnify insured defendants, Abesol Realty, Estate of Bencion Neiss [1], and Neiss Management ("insured defendants"), in an underlying action for personal injuries suffered by defendant Anthony Thompson, an infant, as a result of his exposure to and ingestion of lead paint in an apartment owned and managed by the defendants.[2] Jurisdiction is proper in this Court under 28 U.S.C. § 1332 for diversity of citizenship and an amount in controversy in excess of $75,000. Venue is

---

1. The Estate of Bencion Neiss was created upon his death on or about November 25, 1998. It is undisputed that upon the admission of Bencion Neiss's will to probate on April 7, 1999, his son, Charles Neiss, became the executor of the Estate.

2. While Catalina Griffith Company is a named defendant in this action and in the underlying personal injury action, it is undisputed that no such entity exists. Catalina Griffith testified in her deposition that she is employed by Neiss Management as a building manager.

proper under 28 U.S.C. § 1391 because the claim arose in this district.

Plaintiff makes three arguments in support of its motion for summary judgment: first, there is no evidence to support a finding that Anthony Thompson's injury occurred during the period that Mount Vernon provided liability coverage to the insured defendants for the apartment building; second, the insured defendants did not provide timely notice of an "occurrence," as required by the insurance policy issued by Mount Vernon, when they received an Order to Abate Nuisance ("Order to Abate") from the New York City Department of Health's Bureau of Lead Poisoning Control ("NYC Bureau of Lead Poisoning Control") on November 5, 1987; and third, insured defendants did not provide timely notice of the lawsuit filed against them by Anthony Thompson and Guiliano Thompson on June 18, 1999.

For the reasons stated below, Plaintiff's motion is denied.

## II. FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are undisputed. On January 31, 1985, Guiliano Thompson moved into the apartment located at 178 Rockaway Parkway, Apartment 4B in Brooklyn, New York ("the apartment"). On October 10, 1985, Guiliano Thompson gave birth to her son, Anthony Thompson, and shortly thereafter he came to live with her in the apartment. On December 26, 1986, ownership of the property located at 178 Rockaway Parkway was transferred from Keltz Realty Corporation to Bencion Neiss. From December 26, 1986 to May 26, 1988, Bencion Neiss and his subsequent estate owned the property located at 178 Rockaway Parkway and maintained and managed the property through Neiss Management. From April 30, 1986 to April 30, 1987, an insurance policy issued by Mount Vernon, policy number GLA095108, provided general liability insurance coverage for the property located at 178 Rockaway Parkway.

On or about October 27, 1987, the NYC Bureau of Lead Poisoning Control inspected the apartment for lead. On November 5, 1987, the NYC Bureau of Lead Poisoning Control issued an Order to Abate indicating the following: a child, Anthony Thompson, residing at the apartment had a blood lead level of 25 micrograms per deciliter, or higher, with a free erythrocyte prophyrin (FEP) of 35 micrograms per deciliter, or higher; that an inspection of the apartment revealed that the paint in various places throughout the apartment contained levels of lead in violation of the New York City Health Code; and that such conditions constituted a nuisance by presenting a danger to the child on the premises. On November 30, 1987, Bencion Neiss mailed a copy of the Order to Abate to his current liability insurer, Pennsylvania Lumberman's Mutual. Bencion Neiss did not notify Mount Vernon of the Order to Abate. On December 7, 1987, Anthony Thompson was admitted to Brookdale Hospital Medical Center for treatment for lead poisoning; on this day, his blood lead level was 42 micrograms per deciliter. On December 15, 1987, Anthony Thompson was released from Brookdale Hospital. Approximately one year later, on or about December 31, 1988, Guiliano and Anthony Thompson moved out of the apartment and the building at 178 Rockaway Parkway. In or about April 1999, Charles Neiss moved to Israel, but continued to maintain his residence at 702 Avenue P in Brooklyn, New York.

On June 16, 1999, Anthony Thompson, an infant by his mother and natural guardian, Guiliano Thompson, filed an action in the Supreme Court of the State of New York, County of Kings, Index No. 21330–

99, against the Estate of Bencion Neiss, Neiss Management and Catilina [sic] Griffith Company for personal injuries suffered by Anthony Thompson as a result of his exposure to and ingestion of lead paint in an apartment owned and managed by the insured defendants. On August 12, 1999, an Affidavit of Service was sworn to by Joel Konig, indicating that personal service on Charles Neiss, Executor of the Estate of Bencion Neiss, was attempted on June 22, 1999, June 25, 1999 and August 9, 1999 at 702 Avenue P in Brooklyn, New York, that service was made on August 9, 1999 by affixing a copy of the summons and complaint to the door at 702 P Avenue, and that service was also made by mailing a copy of the summons and complaint to Charles Neiss at the same address on August 12, 1999.

Charles Neiss's notice of the underlying complaint and subsequent actions are in dispute. In his deposition on February 21, 2002, Mr. Neiss testified that he first received notice of the underlying complaint at the end of November 1999, when he was served with a motion for default judgment by the Thompsons by regular mail. It is undisputed that on or about November 30, 1999, the Thompsons filed a motion for a default judgment against the insured defendants. Mr. Neiss also testified that sometime in early December he received by facsimile from Neiss Management a copy of the summons and complaint in the underlying action at his home in Israel.

On or about October 26, 1999, Mendel Weiss, who has served as an insurance broker to Neiss Management since the mid–1990s, received notice of the Thompson's action against the Estate of Bencion Neiss and Neiss Management. The steps taken by Mendel Weiss after he received notice of the claim are disputed. Mr. Weiss stated in his June 6, 2002 deposition that on October 27, 1999, his office faxed a copy of the pleadings to United Insurance Consultants, an insurance consultant retained by Neiss Management to handle insurance matters, because he was not the insurance broker at the time the lead problem occurred in the Thompsons' apartment at 178 Rockaway Parkway. Mr. Weiss stated that he thought another insurance broker named Israel Shurkin, who worked for Neiss Management in the 1980s, may have been the person who handled insurance during the time in question. Mr. Weiss also produced evidence supporting this action in the form of a facsimile cover page addressed to United Insurance Consultants. Other notes produced by Mr. Weiss indicate that in or about December 1999 Mr. Shurkin informed Mr. Weiss's office that he was not the insurance broker at the time in question. It is undisputed that on December 9, 1999, Mr. Weiss's office faxed information about the Thompsons' lawsuit to Pennsylvania Lumberman's Mutual and Crump of New York, both previous insurers to Neiss Management that Mr. Weiss learned of by reviewing records he obtained from Neiss Management.

It is undisputed that on December 30, 1999, Crump of New York forwarded the summons and complaint to Mount Vernon, though it is not clear from the record how Crump learned of the policies Mount Vernon had issued to Neiss Management. Crump's cover letter to Mount Vernon referenced policy number GLA68007, which is a general liability policy issued by Mount Vernon to Neiss Management for various properties for the time period of April 30, 1986 to April 30, 1987, but this policy did not cover the property located at 178 Rockaway Parkway. It is undisputed that on or about January 6, 2000, Mount Vernon disclaimed coverage of the underlying claim under policy number GLA68007 based on lack of coverage for the location and for lack of timely notice of the Thomp-

sons' original complaint. Sometime after January 6, 2000, Plaintiff learned of the claim under the correct policy number when an employee was reviewing a different claim file pending against defendant Abesol. Finally, it is undisputed that on or about April 11, 2000, Mount Vernon disclaimed coverage of the underlying claim under policy number GLA095108 for lack of timely notice of the Thompsons' lawsuit. Plaintiff then commenced the current action for a declaratory judgment in this Court on June 30, 2000.

## III. DISCUSSION

### A. Choice of Law

The parties in this diversity action do not dispute that New York law governs this claim. *See, e.g., Andy Warhol Found. for the Visual Arts, Inc. v. Fed. Ins. Co.,* 189 F.3d 208 (2d Cir.1999) (finding that New York law applied where the insured resided in New York, the policy was delivered to them in New York, and the claim against them arose in New York, and concluding that because New York was the state most concerned with the outcome that New York law governed disposition of the case).

### B. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A genuine issue as to a material fact exists when there is sufficient evidence favoring the nonmoving party such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, the non-

moving party "may not rest upon the mere allegations or denials" of its pleadings; rather, its response must go beyond the pleadings to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when evaluating a motion for summary judgment, "[t]he courts must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. America Piles, Inc.,* 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### C. Injury in Fact During the Policy Period

Whether injury in fact occurred during the policy period is a question of fact precluding granting summary judgment to Mount Vernon. Defendants have satisfied their burden under Rule 56(e) by proffering evidence beyond the pleadings that indicates a genuine issue for trial.

The relevant provisions in the insurance policy issued by Mount Vernon read:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . to which this insurance applies, caused by an occurrence . . . .

> "occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury . . . neither expected nor intended from the standpoint of the insured . . . .

> "bodily injury" means bodily injury, sickness or disease sustained by any

person which occurs during the policy period.

(Reale Aff. Ex. A.)[3]

All parties agree that Mount Vernon's obligation to defend or indemnify the insured in the case is triggered if it is determined that an injury in fact occurred during the policy period. While mere exposure that does not result in injury during the policy period would not trigger Mount Vernon's obligation, "a real but undiscovered injury, proved in retrospect to have existed at the relevant time, would establish coverage, irrespective of the time the injury became manifest." *American Home Products Corp. v. Liberty Mut. Ins.*, 748 F.2d 760, 766 (2d Cir.1984). There is no requirement, therefore, that the injury be diagnosable during the policy period. *Id.* Plaintiff's reliance on case law for the proposition that an occurrence of lead paint poisoning is fixed as the date on which exposure results in "diagnosable injury" is misguided. *Mount Vernon Fire Ins. Co. v. Chong*, 1998 WL 178847 (E.D.N.Y.), *General Accident Ins. Co. v. Idbar Realty Corp.*, 163 Misc.2d 809, 622 N.Y.S.2d 417 (1994), upon which *Chong* relies, and *United States Liability Ins. Co. v. Farley*, 215 A.D.2d 371, 626 N.Y.S.2d 238 (2d Dept.1995), all address situations in which a child was initially diagnosed with lead paint poisoning before the insurance policies in question provided coverage to the insured. The insurers in these cases argued that because the injured party's lead poisoning was diagnosed *before* the policy provided coverage, there was no occurrence triggering liability on its policy. In each of these cases, however, the court found that continuous exposure to lead paint after their initial

diagnoses of lead poisoning, but during the coverage period of the insurance policies in question, constituted an "occurrence" under the policy.

Moreover, New York also permits a determination in this case that injury in fact occurred during the policy period, even though it was not diagnosed until after the policy period ended. *See Campbell ex rel. Campbell v. Metrop. Prop. and Cas. Ins. Co.*, 239 F.3d 179, 181 (2d Cir.2001) ("[A]s a matter of law, injury is not commensurate with external manifestation. Thus, it was not necessary for infant plaintiffs to have exhibited external symptoms of lead poisoning . . . so long as plaintiffs established that they sustained a bodily injury." (quoting district court's opinion and order)); *Greater New York Mut. Ins. Co. v. Royal Ins. Co.*, 238 A.D.2d 261, 657 N.Y.S.2d 326 (1st Dept.1997) (stating that "[t]he triggering event for coverage . . . is the onset of disease, whether discovered or not" and finding a duty to defend where "the underlying complaint does not exclude the possibility that injury-in-fact occurred during [the] policy period.")

■ Mount Vernon argues that there is no evidence indicating that Anthony Thompson sustained injury in fact during its policy period and that it is therefore entitled to judgment as a matter of law. In response, defendants have proffered evidence indicating there is a genuine issue as to whether Anthony Thompson sustained injury during Mount Vernon's policy period. Defendant Thompson proffers Guiliano Thompson's Response to Interrogatories # 8 stating that the timeframe of Anthony's lead poisoning was shortly after his birth on October 10, 1985[4] through February 11, 1988 as

---

**3.** Although the parties submit slightly different versions of this language in their memoranda of law, they do not dispute these general provisions of the policy.

**4.** Defendant Thompson's Exhibit C indicates that Anthony Thompson's birth date is October 1, 1985, but other undisputed evidence

evidence, and argues that this "exposure period" is sufficient to establish an occurrence under the policy, namely continuous or repeated exposure resulting in injury. (Minsky Aff. Ex. C.) However, as has already been established, injury itself, rather than exposure that may have eventually resulted in injury, must be demonstrated to have occurred during the policy period. Therefore, this statement, standing alone, is not evidence that the exposure actually resulted in injury during the policy period. Defendant Neiss proffers Guiliano Thompson's sworn deposition testimony indicating that she first observed symptoms of lead poisoning in Anthony in February 1987, including a runny nose, unusual crankiness, and limpness, and that around the same time she was told by a physician that Anthony was suffering from lead paint poisoning. (Dep. Tr. of Guiliano Thompson at 21–24, annexed as Bass Aff. Ex. C.)

Finally, Defendant Thompson proffers the affidavit of a medical doctor as evidence that Anthony sustained injury during the Mount Vernon policy period. (Robert Karp Aff., annexed as Minsky Aff. Ex. D.) Opinion evidence, such as an expert's opinion, must be based on facts in the record or personally known to the witness. When offered to preclude summary judgment, the expert's conclusions must be based on the record and must not be speculative; otherwise, the affidavit does not raise questions of fact sufficient to preclude summary judgment. *Samuel v. Aroneau,* 270 A.D.2d 474, 704 N.Y.S.2d 652 (2d Dept.2000). In his affidavit, Dr. Karp stated that his evaluation of Anthony's medical records led him to determine that when Anthony was diagnosed with lead poisoning in October 1987 he had already been exposed to lead for a period

establishes that he was born on October 10,

between eight and fourteen months. Dr. Karp also provided information regarding his professional background and scholarship in the field of childhood nutrition, including problems associated with child lead poisoning.

■ Mount Vernon argues that Dr. Karp's affidavit is legally insufficient to defeat its motion for summary judgment. Contrary to Plaintiff's assertions, however, Dr. Karp's affidavit satisfies the standard put forth in *Samuel.* First, Dr. Karp's conclusions are based on Anthony Thompson's medical records, focusing specifically on those that indicated Anthony's blood lead level of 42 and free erythrocyte prophyrin (FEP) of 149. The accuracy of these medical records is undisputed. Moreover, Dr. Karp's affidavit established sufficient foundational scientific basis for his conclusions by referencing personal knowledge gained through his extensive professional experience and scholarship in the area of child lead poisoning. Finally, contrary to Plaintiff's assertion, Dr. Karp's affidavit is not Defendants' sole evidence in support of its contention that injury in fact occurred during Mount Vernon's policy period; therefore, Defendants are not required to satisfy the standard that applies when an expert affidavit is the sole evidence offered to defeat summary judgment. *Romano v. Stanley,* 90 N.Y.2d 444, 445, 661 N.Y.S.2d 589, 684 N.E.2d 19, 23 (1997) (holding that when an expert's affidavit is proffered as the sole evidence to defeat summary judgment, it must include "sufficient allegations to demonstrate that the conclusions it contains are more than mere speculation and would, if offered alone at trial, support a verdict in the proponent's favor.") As was already mentioned, Defendant has proffered Guiliano

1985.

Thompson's deposition testimony in addition to Dr. Karp's affidavit.

Although Plaintiff argues that there is a lack of evidence that Anthony was observed eating paint chips during the policy period and medical records indicating Anthony's elevated blood lead level prior to his diagnosis and treatment in December 1995, this does not preclude a finding that injury occurred during Mount Vernon's policy period. *See American Empire Ins. Co. v. PSM Ins. Co.*, 259 A.D.2d 341, 687 N.Y.S.2d 32 (1st Dept. 1999) (holding that possibility that injury occurred during policy period was not precluded where child was not observed ingesting lead paint during the policy period and no medical records were offered to indicate that child had an elevated lead level during the policy period.)

Because the question of whether injury in fact occurred during the policy period remains a disputed issue of material fact, Mount Vernon's motion for summary judgment is denied.

### D. Notice of the "Occurrence" and "Suit"

Whether the insured defendants' delay in providing timely notice to Mount Vernon of the occurrence and the subsequent lawsuit are questions of fact precluding granting summary judgment for Plaintiff. Defendants have satisfied their burden under Rule 56(e) by proffering evidence beyond the pleadings that indicates a genuine issue for trial.

The relevant portion of the notice provision in the insurance policy issued by Mount Vernon reads:

Insured's Duties in the Event of Occurrence, Claim or Suit:

(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with regard to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(Reale Aff. Ex.A).

It is well settled that New York law requires compliance with the notice provisions of a liability policy as a condition precedent to coverage. *See Security Mut. Ins. Co. of New York v. Acker–Fitzsimons Corp.*, 31 N.Y.2d 436, 440, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972); *Reynolds Metal Co. v. Aetna Cas. & Sur. Co.*, 259 A.D.2d 195, 199, 696 N.Y.S.2d 563, 566–67 (3d Dept.1999). Therefore, "absent a valid excuse, a failure to satisfy the notice requirement vitiates the policy... and the insurer need not show prejudice before it can assert the defense of noncompliance." *Acker–Fitzsimons*, 31 N.Y.2d 436 at 440, 340 N.Y.S.2d 902, 293 N.E.2d 76.

Under New York insurance law, policy clauses requiring notice "as soon as practicable" are construed to require notice "within a reasonable time after the duty to give notice has arisen." *Christiania Gen. Ins. Co. of New York v. Great American Ins. Co.*, 979 F.2d 268, 275 (2d Cir.1992); *Acker–Fitzsimons Corp.*, 31 N.Y.2d at 441, 340 N.Y.S.2d 902, 293 N.E.2d 76. The determination of when the duty to give notice accrues requires an objective evaluation to ascertain "whether the circumstances known to the insured at that time would have suggested to a reasonable per-

son the possibility of a claim." *Sparacino v. Pawtucket Mut. Ins. Co.*, 50 F.3d 141, 143 (2d Cir.1995); *Mount Vernon Fire. Ins. Co. v. DLRH Assoc.*, 967 F.Supp. 105 (S.D.N.Y.1997); *see also Christiania Gen. Ins. Corp. of New York v. Great Amer. Ins. Co.*, 979 F.2d 268 (2d Cir.1992); *Utica Mutual Insurance Co. v. Fireman's Fund Insurance Cos.*, 748 F.2d 118, 121 (2d Cir. 1984).

▮ Whether or not an insured's failure to provide timely notice to an insurer is reasonable under the circumstances is ordinarily a question of fact precluding summary judgment. *Kaliandasani v. Otsego Mut. Fire. Ins. Co.*, 256 A.D.2d 310, 681 N.Y.S.2d 323 (2d Dept.1998). However, a delay in notice may be unreasonable as a matter of law when no excuse for the delay is put forth or the proffered excuse is meritless. *Olin Corp. v. Ins. Co. of North America*, 966 F.2d 718, 724 (2d Cir. 1992).

▮ When asserting an excuse for delay in notice to its insurer, such as a good faith belief in nonliability or ignorance of available coverage, an insured carries the burden of proof that its delay was reasonable. *United States Underwriters Ins. Co. v. Congregation B'Nai Israel,* 900 F.Supp. 641, 646 (E.D.N.Y.1995); *Acker–Fitzsimons Corp., supra*, 31 N.Y.2d 436 at 440, 340 N.Y.S.2d 902, 293 N.E.2d 76.

### 1. Notice of the "Occurrence"

▮ The first question of notice presented is whether or not the notice provision in the insurance policy issued by Mount Vernon was triggered when insured defendants received the Order to Abate on November 5, 1987, and, if so, whether insured defendants' failure to provide notice to Mount Vernon of the Order to Abate was reasonable under the circumstances. Because answers to these questions in-

volved disputed issues of fact, plaintiff's motion for summary judgment is denied.

The Mount Vernon policy required insured defendants to provide notice in the event of an "occurrence," which the policy defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury... neither expected nor intended from the standpoint of the insured." (Reale Aff. Ex. A.) Mount Vernon asserts that insured defendants' failure to provide notice of the Order to Abate issued on November 5, 1987 violated the policy provision requiring notice of an "occurrence." However, New York courts hold that an order to abate a lead paint nuisance, without more, is insufficient to trigger the notice requirement under the insurance policy. *See Mount Vernon Fire Ins. Co. v. Chong*, 1998 WL 178847 (E.D.N.Y.1998); *Mount Vernon Fire Ins. Co. v. East Side Renaissance Assoc.*, 893 F.Supp. 242 (S.D.N.Y.1995); *Public Serv. Mut. Ins. Co. v. AYFAS Realty Corp.*, 234 A.D.2d 226, 651 N.Y.S.2d 513 (1st Dep't 1996).

Insured defendants assert as an excuse for its failure to provide notice its belief that the Order to Abate did not constitute an occurrence under the policy because the Order did not contain any mention that bodily injury had occurred; therefore, insured defendants reasonably believed the notice provision in the Mount Vernon policy was not triggered. As evidence for this assertion, insured defendants rely on the undisputed fact that the Order to Abate did not indicate that Anthony Thompson had suffered bodily injury as a result of his elevated blood level. In *AYFAS Realty, supra*, the court evaluated a similar order providing notice of a lead problem to a landlord, and concluded that:

> [W]hile the Order, which described both the blood-lead level and the lead level of the paint in technical language, is clearly

suggestive of harmful conditions in the apartment, it did not indicate that an injury had occurred or that the blood-lead level was caused by exposure to conditions in the apartment.... The Order, in itself, would not necessarily suggest to a reasonable person a potential liability.

*AYFAS Realty Corp.*, 234 A.D.2d 226, 227–28, 651 N.Y.S.2d 513 (citations omitted). In *AYFAS Realty,* however, the court also found relevant that the Order did not identify the name of the tenant who had a heightened blood level, or that the person was an infant. *Id.* at 227, 651 N.Y.S.2d 513. Similarly, the infant tenants with heightened blood levels in *East Side Renaissance Associates, supra,* and *Scharf v. Generali–U.S. Branch,* 259 A.D.2d 349, 687 N.Y.S.2d 47 (1st Dept.1999) were not identified by name. Here, Anthony Thompson was identified by name and as an infant. Also, the court in *East Side Renaissance Associates* distinguished another lead paint case, *Mount Vernon Fire Ins. Co. v. Arec Bros. Corp.,* No. 91 Civ 708 (E.D.N.Y. 1995), in which the Order in question explicitly stated that the conditions of the apartment "present a danger to the life or health of the *child/children* of the above-referenced premises," and it had been established that the managing agent of the apartment building was told by the tenant that the tenant's child, who also lived in the apartment, had been hospitalized due to lead poisoning. *East Side Renaissance Associates,* 893 F.Supp. at 249 (emphasis in original). In this case, while the Order to Abate did include a specific reference to the hazard presented to children by lead in the apartment, defendants have presented deposition testimony from Guiliano Thompson indicating that insured defendants were never informed of Anthony Thompson's hospitalization for lead poisoning in December 1987. It remains a question of fact, therefore, whether the Order

to Abate standing alone contained sufficient information to constitute an "occurrence" requiring notice to Mount Vernon.

Plaintiff argues that insured defendants had a duty to investigate the circumstances surrounding the Order to Abate, and had they done so, would have learned of Anthony Thompson's lead paint injury. It is well settled that an insured "must exercise reasonable care and diligence to keep himself informed of accidents out of which claims for damages may arise." *Acker–Fitzsimons Corp., supra,* 31 N.Y.2d at 441, 340 N.Y.S.2d 902, 293 N.E.2d at 79 (1972). However, the standard governing an insured's duty to investigate is reasonableness under the circumstances. *Mount Vernon Fire Ins. Co. v. East Side Renaissance Assoc.,* 893 F.Supp. 242, 248 (S.D.N.Y.1995). The facts presented here are analogous to those to *East Side Renaissance Associates,* in which a general liability insurer (the same one in this action) sought a declaratory judgment that insured landlord failed to give timely notice of occurrence after receiving notice that a person residing in one of landlord's apartments had an elevated blood lead level and that the apartment's lead paint content violated New York City law. The court concluded that receipt of the Order did not compel the insured to investigate the circumstances surrounding it:

> I find that receipt of this Order... would not place a reasonable owner/landlord, acting in good faith, on notice that a tenant had suffered bodily injury and that it might be sued as a result of such injury. Further, I find that receipt of the Order would not have caused a reasonable and prudent owner to further investigate. Indeed, if receipt of an "Order to Landlord/Agent" to remove lead from an apartment, without more, was sufficient notice of a personal injury claim, then thousands of landlords

in New York have likely failed to provide timely notice of claims to their insurers, thereby effectively depriving owners of coverage and plaintiffs of a reliable deep pocket.

*East Side Renaissance Assoc.,* 893 F.Supp. at 249.

The cases Plaintiff relies on in support of its argument that insured defendants had a duty to investigate are easily distinguishable on their facts, as they involved serious accidents where the insured had learned that some injury had occurred but did not investigate the matter to ascertain potential liability. *See Mount Vernon Fire Ins. Co. v. DLRH Assoc.,* 967 F.Supp. 105 (S.D.N.Y.1997) (finding that hotel owner had a duty to investigate when it learned that one of its residents was injured in a fall from a third story window in the hotel); *Security Mutual Ins. Co. of New York v. Acker–Fitzsimons Corp.,* 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972) (finding that building owner had a duty to investigate where owner learned of fire and injuries to firefighters in his building in a news article that specifically mentioned owner's possible liability); *Haas Tobacco Co. v. American Fidelity Co.,* 123 N.E. 755, 226 N.Y. 343 (1919) (finding that company had a duty to investigate when one of its trucks hit and injured a child). Finally, *Christiania Gen. Ins. Corp. of New York v. Great Amer. Ins. Co.,* 979 F.2d 268 (2d Cir.1992), does not support Plaintiff's argument that it is entitled to summary judgment. While the court there stated that "[d]efendant cannot complain it did not see something when it shut its eyes," the court ultimately concluded that the question of whether insured had an obligation to investigate was a question of fact for a jury to resolve. 979 F.2d at 276. Here, as in *East Side Renaissance Associates,* the Order to Abate did not include sufficient information to suggest to insured defendants that

Anthony Thompson has suffered bodily injury; without additional information, therefore, receipt of the Order did not establish that insured defendants had a duty to investigate.

Plaintiff also argues that the undisputed fact that Bencion Neiss notified his then current insurance carrier, Pennsylvania Lumberman's Mutual, shortly after he received the Order to Abate demonstrates his awareness of the possibility of a claim under the Mount Vernon policy, thus vitiating insured defendants' argument that they were excused from their obligation to provide timely notice because of a good faith belief in their nonliability. The letter Bencion Neiss included with a copy of the Order to Abate he sent to Pennsylvania Lumberman's stated, "[p]lease be advised that we have received a notice from the NYC Dept. [sic] of Health, stating that there is peeling paint in the above referenced apartment. They further state that they believe it to contain lead, but we do not know this to be true." (Sokoloff Decl. Ex. B.) Plaintiff argues that Bencion Neiss's awareness is further supported by the fact that his company was a "sophisticated real estate management firm" that had dealt with numerous lead paint violations over the years. (Mem. of Law in Supp. of Pl.'s Mo. for Summ. J. at 11.)

■ Plaintiff's assertions regarding Bencion Neiss's action and level of sophistication could support an inference that Bencion Neiss interpreted the Order to Abate as an occurrence that might subject him to liability. However, a reasonable inference in defendants' favor may also be drawn, namely that Bencion Neiss believed the Order to Abate warranted apprising his current general liability insurer of the situation, but that nothing in the Order to Abate indicated to him that he might be subject to liability implicating the Mount

Vernon policy that had expired six months prior. Because the courts must view evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor, and because there are genuine issues of material fact on which a finder of fact might reasonably find for the party opposing summary judgment, Plaintiff's motion for summary judgment is unwarranted. *L.B. Foster Co. v. America Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citations omitted).

In summary, insured defendants' failure to notify Mount Vernon when it received the Order to Abate is not unreasonable as a matter of law. Insured defendants have proffered evidence to support its assertion that it reasonably believed the Order to Abate was not an occurrence triggering the notice requirement in the Mount Vernon policy. Because the question of insured defendants' reasonableness remains a disputed issue of material fact, Plaintiff's motion for summary judgment is denied.

### 2. Notice of the "Suit"

The second question of notice presented is whether or not insured defendants' delay in notifying Mount Vernon of the summons and complaint filed against them by the Thompsons was reasonable under the circumstances. Because this determination involves disputed issues of material fact, plaintiff's motion for summary judgment is denied.

 Once an insured has been served with a summons and complaint from a third party claiming injury, the insured can no longer claim a good faith belief in nonliability for the underlying occurrence. *American Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 439 (2d Cir. 1995); *New York v. Blank*, 27 F.3d 783, 795–96 (2d Cir.1994); *Garfield Slope Hous. Corp. v. Public Serv. Mut. Ins. Co.*, 973

F.Supp. 326, 334 (E.D.N.Y.1997). However, an insured may assert as an excuse for the delay a justifiable lack of knowledge of insurance coverage. *Winstead v. Uniondale Union Free School Dist.*, 201 A.D.2d 721, 608 N.Y.S.2d 487 (2d Dept.1994). To prevail on this theory, an insured must prove that he or she was ignorant of the available coverage, and that he or she made "reasonably diligent efforts to ascertain whether coverage existed." *Id.* at 723, 608 N.Y.S.2d 487. In their evaluations of such claims, courts have looked to evidence that an insured "acted with due diligence in order to protect his own interests" upon receiving notice of a claim. *Seemann v. Sterling Ins. Co.*, 267 A.D.2d 677, 699 N.Y.S.2d 542 (3d Dept.1999); *Winstead*, 201 A.D.2d at 723, 608 N.Y.S.2d 487.

The facts surrounding insured defendants' receipt of the summons and complaint filed against them by the Thompsons and the inferences to be drawn from them are in dispute. While insured defendants argue that service of the underlying action was not properly made by the Thompsons, the issue of the correctness of service is irrelevant to a determination of when insured defendants actually learned of the lawsuit. In any event, Plaintiff is correct that even if insured defendants were not served properly with the summons and complaint in the underlying action, once they saw the papers and established that they were potentially liable for alleged injury incurred on their property during the dates of the Mount Vernon policy, the notice requirement in the Mount Vernon policy was triggered. Although the exact date insured defendants became aware of their potential liability is a disputed question of fact, it can be no later than October 26, 1999, when their insurance broker, Mendel Weiss, learned

of the lawsuit.[5] The question, then, is whether the two to more than four month delay between the time insured defendants became aware of their potential liability to the Thompsons and December 30, 1999, when Mount Vernon received notice of the suit, was reasonable under the circumstances.

■ Insured defendants assert that the delay was reasonable because the twelve year lapse between Anthony Thompson's exposure to lead and the filing of the Thompsons' lawsuit required time to investigate and determine which of its insurance policies were implicated. They have presented evidence to support their assertion that once they had actual notice of the lawsuit, they made diligent efforts to ascertain the appropriate insurance brokers and applicable insurance policies. It appears that most of the efforts to locate the brokers and policies was made by insured defendants' current insurance broker, Mendel Weiss. Insured defendants have not explained how Mr. Weiss learned of the lawsuit on October 26, 1999—approximately one month before Mr. Neiss learned of it at the end of November or early December 1999. They

have, however, presented ample documentary and testimonial evidence explaining the steps taken by Mr. Weiss to ascertain the appropriate insurance broker and insurance policies that ultimately led to Mount Vernon's notification of the lawsuit.[6] Insured defendants assert that this process took some time because the alleged injury occurred twelve years earlier in one of the fifty-two buildings owned by the insureds at the time of the Anthony Thompson's exposure; therefore, the records were not readily available. This evidence of insured defendants' excuse is not patently without merit and is therefore sufficient to establish a question of material fact as to the reasonableness of insured defendants' delay in establishing policy coverage and providing notice to Mount Vernon. *See Kaliandasani v. Otsego Mut. Fire. Ins. Co.*, 256 A.D.2d 310, 681 N.Y.S.2d 323 (2d Dept.1998) (whether or not an insured's failure to provide timely notice to an insurer is reasonable under the circumstances is ordinarily a question of fact precluding summary judgment); *Olin Corp. v. Ins. Co. of North America*, 966 F.2d 718, 724 (2d Cir.1992) (a delay in notice may be unreasonable as a matter of

5. Mendel Weiss serves as an agent for the insured defendants; therefore, his notice of potential liability is sufficient to trigger the notice requirement, even if Charles Neiss did not, as he asserts, learn of the underlying lawsuit against the Estate of Bencion Neiss until he received the Motion for Default Judgment that the Thompsons served on him on November 30, 1999.

6. Plaintiff emphasizes that notice was also improper because it was ultimately made under the wrong policy number. (Reale Aff. ¶¶ 8–9.) The policy number referenced in the initial notice was for another general liability policy issued by Plaintiff to the insured defendants that provided coverage for a number of defendants' other buildings. Plaintiff asserts that it only learned of the correct policy while reviewing a different claim against the same

insured defendants. (*Id.* at ¶ 10.) However, nothing in the policy issued by Mount Vernon required the insured defendants to file claims under the correct policy number. The policy states that in the event of an "occurrence," the insured must provide "written notice containing particulars sufficient to identify the insured," and says nothing about the content of notice regarding a "claim" or "suit." (Reale Aff. Ex. A.) It says only that "insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." *Id.* While providing the correct policy number on communications with an insurer clearly assists the insurer in processing the claim, it is by no means a condition precedent to coverage; therefore, Plaintiff's assertion is without merit.

law when no excuse for the delay is put forth or the proffered excuse is meritless).

In summary, insured defendants' delay in notifying Mount Vernon of the lawsuit against them is not unreasonable as a matter of law. Insured defendants have proffered sufficient evidence to support their assertion that their delay is excusable because they were justifiably ignorant of the available coverage at the time they learned of the lawsuit and that they undertook reasonably diligent efforts to identify and notify relevant insurers. Because the question of whether insured defendants' delay was reasonable remains a disputed issue of material fact, Plaintiff's motion for summary judgment is denied.

## IV. CONCLUSION

Because disputed issues of material fact remain as to (1) whether Anthony Thompson's injury occurred during the period that Mount Vernon provided liability coverage to the insured defendants for the apartment building, (2) whether insured defendants' failure to provide notice of an "occurrence" when they received the Order to Abate was reasonable, and (3) whether insured defendants' delay in providing notice of the underlying lawsuit was reasonable, Plaintiff's motion for summary judgment is denied.

SO ORDERED.