CADE & SAUNDERS, P.C.
and William J. Cade,
Esq., Plaintiffs,

v.

CHICAGO INSURANCE COMPANY,
Defendant.

No. 1:02 CV 1203.

United States District Court,
N.D. New York.

Aug. 25, 2004.

---

Carter Conboy Case, Blackmore Maloney & Laird (John T. Maloney, Esq., Nancy E. May–Skinner, Esq., of Counsel), Albany, NY, for Plaintiffs.

Steinberg & Cavaliere (Steven A. Coploff, Esq., of Counsel) White Plains, NY, for Defendant.

## MEMORANDUM–DECISION AND ORDER

MCCURN, Senior District Judge.

On July 26, 2004, the court conducted a one day, non-jury trial in this action. Following constitutes the court's findings of fact and conclusions of law as Fed.R.Civ.P. 52(a) requires.

### *Findings of Fact*

This matter was previously before the court on the parties' cross-motions for summary judgment. Based upon the record as then constituted the relevant facts were set forth in some detail. *See Cade & Saunders, P.C. v. Chicago Insurance Co.,* 307 F.Supp.2d 442 (N.D.N.Y.2004) (*"Cade I"*). The only change between now and then is that the post-trial facts are more fully developed than was the summary judgment record. To avoid needless repetition the court hereby adopts the facts as outlined in *Cade I.* In addition to those facts, the following facts were established based upon the evidence produced at trial and the testimony of the two witnesses, Kyran Nigro and plaintiff William Cade, Esq.[1]

### I. *Retention of Cade & Saunders*

Attorney Kyran Nigro began working with the plaintiff law firm in June 1998. Prior to that Kyran had been an attorney with another firm for approximately six years. In September 1998, around Labor Day Kyran's, aunt, Laura Nigro, contacted him about the possibility of the Cade firm representing her and her husband, Joe Nigro, Kyran's uncle. A few years earlier, Joe Nigro had been driving a car in which he wife was a passenger. While making a left turn, the Nigros vehicle was rear-ended, causing it to flip end over end. Mr. Nigro sustained injuries. In Kyran's opinion, the most serious of those injuries was a closed head injury. Through their attorneys at the time, on May 23, 1995, the law firm of DeGraff, Foy, Holt–Harris, Mealey and Kunz (the "DeGraff firm"),the Nigros commenced a personal injury action against the driver of the other car, James T. Moore. Pl. exh. 6 at 3, ¶ 10. Mr. Moore was represented by attorney Edward Flink.

Mrs. Nigro first contacted Kyran about that lawsuit shortly before the 1998 Labor Day weekend. She told Kyran that she was dissatisfied with the representation of the DeGraff firm and asked if Kyran would represent her and her husband. Likewise, plaintiff Cade testified that it was his understanding that there had been "murmurs of discontent" about the DeGraff firm's representation of the Nigros. In any event, Mrs. Nigro asked Kyran if his firm would take the case to trial in "early October [1998,]" *i.e.* approximately one month later. Kyran did not think that he had the authority to accept this case without first consulting with attorney Cade. He did so and Cade agreed to meet Kyran; the Nigros; Mr. Kunz of the DeGraff firm, the Nigros' lawyer at the time; and the liabili-

---

1. In addition to Mr. Cade, the law firm of which he is the president, Cade & Saunders, P.C. ("the Cade firm" or "the firm"), is also a named plaintiff in this action.

ty expert already retained by the DeGraff firm, at the accident scene on Labor Day, September 7, 1998.[2]

### A. Liability Expert

During that approximately one hour visit on September 7th, Kyran testified that he and Cade discussed the DeGraff firm's chosen expert. Kyran and Cade were uneasy with that expert and decided to retain someone else. Kyran explained that in making the "multi-level inquiry" which is necessary in choosing an expert, one factor to consider is whether the expert will relate well to a jury. Neither Kyran nor Cade had the sense that the DeGraff expert would. Kyran then informed his aunt that if the Cade firm was going to handle the Nigro's personal injury action, it would want to retain its own expert.

Due to the close familial relationship between Kyran and the Nigros, it was decided that it was in the best interests of the Nigros to have Mr. Cade be the trial lawyer rather than Kyran. Kyran explained this to his aunt and also told her that due to prior professional commitments, Mr. Cade would not be available on the scheduled October 19th trial date. Given the need to retain a new liability expert and Mr. Cade's prior commitments, Kyran informed his aunt that he would seek an adjournment. From his prior litigation experience, Kyran testified that a judge is more likely to grant an adjournment if opposing counsel agrees. Mr. Flink, the defense lawyer in the Nigros' personal injury action, would not consent however and so Kyran sought an adjournment from the court.

Kyran has no independent recollection of the date of the adjournment conference, but in reviewing documents in preparation for his testimony, Kyran believes that it

was held on September 23, 1998. In addition to Kyran, also present at that court conference were attorneys Flink and Kunz. Kyran did "not remember the specifics of the conversations regarding expert disclosure at the time of the [court] conference." Pl. exh. 10 at 2. There is nothing else in the record to shed any light on this issue.

During that conference Kyran took the position that an adjournment was necessary because of: (1) the Cade firm's recent involvement; (2) Mr. Cade's unavailability; and (3) the complexity of the case requiring additional time for the Cade firm to get up to speed. For example, Kyran testified that in his experience this case was difficult from both a liability and medical standpoint. In terms of liability, Mr. Nigro had turned left across three lanes of traffic. Id. at 1. As to the medical aspect of the case, Mr. Nigro had "a closed head injury for which [he] underwent significant neuropsychological treatment." Id. at 1. This made the medical proof highly technical. In fact, in the few weeks prior to trial Kyran was focusing heavily upon the logistics of calling five or six medical experts and taking the videotape deposition of one. Despite the foregoing, the judge denied the request for an adjournment.

Kyran immediately advised the Nigros that he had been unable to get an adjournment. Given that attorney Cade was not able to try their case on October 19th, Kyran recommended another trial lawyer from a different law firm, John Pennock. Kyran and the Nigros met with Mr. Pennock some time during the week of September 23rd. Kyran recalled that during that the meeting went well and the Nigros agreed to have Pennock serve as trial counsel. Consistent with Mr. Cade's testimony, Kyran unequivocally testified that

---

**2.** As requested, pursuant to Fed.R.Evid. 201, the court takes judicial notice of the fact that

in 1998 Labor Day was on Monday, September 7.

after stepping briefly into that meeting Cade had no "substantive involvement" with the Nigros' case.

### 1. Expert Disclosure

As to plaintiffs' efforts to obtain a different liability expert, Kyran testified that he believes he first contacted Dr. Raymond Hagglund within one or two weeks of the firm's decision to accept the Nigros' case. The firm agreed to accept the Nigros' case in early September 1998. Kyran further testified that he wanted to retain Hagglund because the firm had previously retained him and he was "probably one of the most imminently qualified accident reconstruction experts" around. Kyran described Dr. Hagglund as having a "fantastic rapport" with a jury. Due to his teaching responsibilities at Wooster Polytechnic Institute and other outside commitments, however, the first date Dr. Hagglund was available to view the accident scene until Columbus Day, October 12, 1998—one week prior to trial.[3]

Kyran and Hagglund met at the accident scene on that date so Hagglund could collect raw data upon which to base his opinion (and his report) regarding liability. Hagglund assured Kyran that he would get back to Kyran as soon as he could with his opinion. Due to unforeseen circumstances, that did not happen. As it turns out, right after viewing the accident scene Hagglund was subpoenaed for another trial in Vermont. Therefore, he was unable to finish his report.

During the week between the October 12th accident site visit and the October 19th trial date, Kyran tried to get in touch with Hagglund several times, but he was unsuccessful. Over the weekend just prior to trial, October 17th and 18th, Dr. Hagglund called Kyran from Vermont and gave his "general opinion" so that Kyran could formulate an expert disclosure. On October 18th, just one day before trial, based upon his telephone conversation with Hagglund, Kyran prepared an expert disclosure based upon this phone conversation with Hagglund. He intended to serve that response on defense counsel the next day prior to picking the jury, and he did. *See* Pl. exh. 2 at 000032.

#### a. Pre-trial Motions

The next day, on October 19, 1998, the morning the trial was to commence, attorneys defense counsel was served with the supplemental disclosure Kyran had prepared the day before. *See* Pl. exh. 2 at 000032 and 000056. Before a jury was drawn, the court heard a motion by defense counsel Flink seeking to preclude Hagglund's testimony based upon late expert disclosure. Plaintiffs in turn sought an order to compel defendant to accept this disclosure.

Arguing for preclusion, Flink pointed out that at a September 1998 the Nigros had raised the issue of making "an application for leave to serve a late expert response." *Id.* at 000056. Flink further argued that at that time the court had given a "direction that all expert responses be served by September 15th, which he and attorney Kunz (the Nigros' counsel at the time) and agreed to extend until September 18, 1998." *Id.* at 000057. Attorney Flink reasoned that in light of the foregoing, the Nigros should have made such an application at the September conference "or within a day or two thereafter." *Id.* Because they did not, Flink moved to preclude Hagglund's testimony based upon late expert disclosure.

In arguing against preclusion, attorney Pennock, the Nigros' trial counsel, explained that "immediately" upon being re-

---

3. Again, pursuant to Fed.R.Evid. 201, the court takes judicial notice of this fact.

tained by the Cade firm, Dr. Hagglund was hired to do an accident reconstruction evaluation, "and [the Nigros] attempted to let defense counsel know that this would be coming." *Id.* Pennock continued, "Unfortunately, for the past three weeks, Mr. Hagglund has been in trial. He continues to be in trial in Vermont today and through Tuesday[.]" *Id.* Pennock stated that they hoped Hagglund would be available later on in that first week of trial. *Id.* Shifting gears, Pennock noted that nothing in the expert's response or testimony should come as any surprise as plaintiffs had "alleged that the defendant was speeding and that he failed to pay proper attention through the course of this case." *Id.* at 000058.

Pennock further argued that he was not aware of "any Court rule that requires the disclosure of expert witnesses any time before trial." *Id.* Acknowledging that such disclosures should be done at the "first available opportunity," Pennock asserted that that was done by providing Hagglund's disclosure the morning of trial. *Id.* Pennock mentioned that although he had spoken to the Nigros' first lawyer, Mr. Kunz, there was no mention of any expert disclosure deadlines.

When questioned by the court, attorney Flink confirmed that while there had been a court conference nothing "was ... reduced to writing" regarding expert disclosure deadlines. *Id.* This explains why Kyran was not aware of any such order, especially since the DeGraff firm's file did not contain anything about a liability expert. Nor was there anything in the file about a court ordered expert disclosure date, such as correspondence between counsel. Moreover, there had been no earlier expert disclosure by the DeGraff firm, despite the fact that defendant had served a demand for same in July 1995. Nor had attorney Kunz mentioned the purported September 18th deadline to Kyran.

CIC relies heavily upon the court's preclusion order to justify its position that it has no obligation to defend or indemnify plaintiffs in the underlying malpractice action. That reliance warrants a complete recitation of the trial court's decision. In that oral decision the court acknowledged that "there is no specific time limit[ ] set forth in the CPLR for the service of expert responses[.]" Pl. exh. 2 at 000059. Nonetheless the court continued:

[it] must balance the interest of both sides and determine the harm or prejudice done to either side when an expert response such as this is served on the day of the trial. The fact that Mr. Hagglund may have been in trial for a couple of weeks does not explain why before then no expert response was served, or at least, an outline of the expert response.

I've looked at the expert response and not only is this expert expected to provide testimony concerning the accident scene, but testing done at the scene and his interpretation of the police report, photographs, deposition transcripts and under all the circumstances, I find that it would be prejudicial to the defendants to allow this expert to testify in view of the fact that the defendants have not had ample opportunity and will not have had ample opportunity by the time Mr. Hagglund testifies, even if it is not until the beginning of next week, to go out, retain an expert, have that expert review Mr. Hagglund's findings and determine whether or not the defense expert could offer an opinion or provide the defense with an opinion concerning the issues raised in the expert response.

Accordingly, Mr. Hagglund is precluded from testifying.

*Id.* at 000059–000060.

## II. Trial

Obviously the Nigros did not have a liability expert, but neither did the defen-

dant. The defense called the police at the scene to testify as to the accident itself and Mr. Nigro also testified about the accident. The greater portion of the trial (75–80%), however, was devoted to medical proof about Mr. Nigro's claimed injuries. That is understandable given that he sustained a closed head injury—an injury which normally is not visible and the repercussions of which are more difficult to perceive than, for example, a broken bone. Further complicating the damage issue was the fact that there was also proof of marital discord between Mr. and Mrs. Nigro, as well as their financial problems.

The trial court denied the Nigros' motion for a directed verdict at the close of their case, as well as denying the renewal of that motion at the close of all the proof. It can certainly be gleaned from the foregoing that the court decided to submit the case to the jury because there was a question of fact at least as to defendant's negligence. The jury returned a defense verdict after deliberating approximately 20 minutes. Although Kyran was not present when the verdict came in he spoke with his aunt and uncle about the verdict, telling them how sorry he was. *See* Pl. exh. 16 at 2. Despite being "very upset," Kyran's aunt hugged him and thanked him for all of his hard work.

### III. Verdict and Post–Verdict

After the trial Kyran had further discussions with his aunt and uncle about their appeal rights. Kyran realistically explained that in his opinion an appeal would be very difficult because with respect to the preclusion order, it was within the judge's discretion. As to the verdict itself, Kyran further explained that they would have to show that it was against the weight of the evidence—another difficult legal standard to meet. Succinctly put, Kyran candidly told them that an appeal

on this basis was a "long shot." *Id.* The Cade firm did not have enough lawyers to handle the appeal, so attorney Keach was retained for that purpose.

### IV. Appeal

The Third Department issued its decision on November 16, 2000, affirming the verdict with costs. According to that court, the "only" issue on appeal was whether the "Supreme Court abused its discretion in precluding the testimony of their accident reconstruction expert, Raymond Hagglund, on the basis of their untimely response to defendants' demand for expert disclosure." Def. exh. F at 1 The Appellate Division found no abuse of discretion. *Id.* at 2. In so doing it recognized that CPLR § 3101(d)(1)(i) contains a "good cause" requirement when an expert is retained "an insufficient period of time before the commencement of trial to give appropriate notice thereof[.]" *Id.* at 2 (quoting § 3101(d)(1)(i)). The court agreed with the trial judge however that plaintiffs had not shown good cause "for having retained their reconstruction expert more than three years after commencement of the action and a matter of just a few weeks prior to trial." *Id.* The Appellate Division also relied upon the fact that plaintiffs did not offer an excuse "for their failure to comply with Supreme Court's September 18, 1998 deadline for service of particulars regarding Hagglund." *Id.* Finally the court noted that "[n]o reason [was] given why the expert's involvement in a trial in Vermont prevented plaintiffs from furnishing the required information[,]" and the court could "perceive [of] none." *Id.*

### V. Notice

Roughly a year and a half after the Appellate Department's decision, by letter dated October 18, 2001, plaintiff Cade was

advised that the Nigros had retained another law firm "relative to a potential legal malpractice claim against [his] Firm arising out of the loss of [the Nigros'] personal injury claim." Pl. exh. 3. That letter further stated that "[t]he failure to timely serve an Expert Witness Response on the issue of liability was a critical error which severely compromised [the Nigros'] opportunity to prevail." Id. A few days later the Cade firm forwarded this letter to CIC, and CIC received it on October 29, 2001. See id. In a November 8, 2001 letter, among other things, CIC reserved its right to deny coverage. Pl. exh. 5.

On October 26, 2001 a legal malpractice lawsuit was filed against the plaintiffs herein. Pl. exh. 6. In that complaint the Nigros allege a number of omissions which they believe constitute negligence by the plaintiffs herein. Among those omissions are plaintiffs alleged "fail[ure] to serve an Expert Witness Response for an accident reconstruction expert in a timely fashion; failing to utilize the accident reconstruction expert retained by the [DeGraff] firm ...; failing to timely retain their own accident reconstruction expert so that same may be utilized at the time of trial; and in failing to make a timely motion in order to serve a late notice of Expert Witness Response." Pl. exh. 6 at 5, ¶ 17. That complaint was not served upon plaintiffs until the afternoon of January 3, 2002. Pl. exh. 13. As it had on several prior occasions, in a March 25, 2002 letter, CIC adhered to its original position, denying coverage based in part upon its belief that "there was [not] a reasonable excuse" for plaintiffs' non-compliance with the policy's notice provisions. See Pl. exh. 22.

## Conclusions of Law

### I. Prejudice

There is one preliminary legal issue which the court must address: whether CIC, as the insurer, is required to show prejudice when it disclaims coverage on the basis of late notice. CIC argues that it does not have to show prejudice given the current state of the law in this Circuit. On the other hand, arguing that "the status of New York law regarding whether an insurer must show prejudice to disclaim on notice is unclear[,]" plaintiffs suggest that this is an appropriate case in which to resolve the issue of "whether New York should continue to maintain a no-prejudice rule to notice claims[.]" Pl. Trial Memo. at 17 (citation omitted). The court declines to do so.

It does appear, as plaintiffs suggest, that the tide may be turning in New York in terms of a showing of prejudice in the context of late notice. In Varrichio and Associates v. Chicago Insurance Company, 312 F.3d 544 (2d Cir.2002), the Second Circuit certified the following question to the New York Court of Appeals: "Where an insured has already complied with a policy's notice of claim requirement, does New York require the insurer to demonstrate prejudice in order to disclaim coverage based on the insured's failure to comply with the policy's notice of suit requirement?" Id. at 550. Although the Court of Appeals accepted that certified question, Varrichio, 312 F.3d at 545 (2002), it was withdrawn after the parties entered into a conditional settlement stipulation and the Second Circuit dismissed the appeal. Varrichio v. Chicago Insurance Company, 328 F.3d 50 (2d Cir.2003). Likewise, after that the Court of Appeals marked the certified question withdrawn. Varrichio v. Chicago Insurance Company, 100 N.Y.2d 527, 760 N.Y.S.2d 761, 790 N.E.2d 1190 (2003).

█ As the foregoing demonstrates, at least for the time being, the state of the law on the issue of prejudice is unchanged in New York: there is no requirement that

an insurer make such a showing when claiming late notice. Indeed, just twelve days after the Court of Appeals marked the certified question withdrawn in *Varrichio*, the Second Circuit in *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282 (2d Cir.2003), reiterated the law in New York pertaining to prejudice in the context of late notice under an insurance policy. The Court stated, "Under New York law, absent a valid excuse, an insured's failure to provide timely notice of a claim to its excess insurer is a complete defense to coverage, *regardless of whether* the *carrier was prejudiced* by the late notice." *Id.* at 287 (emphasis added) (citing *Am. Home Assurance Co. v. Int'l Ins. Co.*, 90 N.Y.2d 433, 440, 661 N.Y.S.2d 584, 684 N.E.2d 14 (1997)). Earlier this year, the court in *Mahl Brothers Oil Co. v. St. Paul Fire & Marine*, 307 F.Supp.2d 474 (W.D.N.Y. 2004), restated the accepted rule in New York for now. "[F]ailure to comply with the notice requirement relieves an insurer of its duty to defend and indemnify, *even where* there has been *no showing by* the *insurer of prejudice to itself.*" *Id.* at 491 (emphasis added) (citations omitted).

██ This district court is not free to disregard the relevant precedent within the Circuit. *See U.S. v. Kaczowski*, 114 F.Supp.2d 143, 166 (W.D.N.Y.1999) ("This court should not, absent convincing grounds to do so, intentionally refuse to follow applicable circuit precedent.") The reason for that is even more compelling where, as here, the issue is clearly a matter of state law. Consequently, despite plaintiffs' assertion to the contrary, CIC does not need to prove prejudice in order to prevail upon its late notice of a potential claim defense.

Paragraph 9(B) of the Professional Liability Insurance Policy which CIC issued to the Cade firm states in relevant part:

> Upon the **Insured** becoming aware of any negligent act, error, omission ... in the rendering of or failure to render **Professional Services** which could reasonably be expected to be the basis of a **Claim** covered hereby, written notice shall be given by the **Insured**, or its representative to the Company together with the fullest information obtainable as soon as practicable.

*See* Pl. exh. 1 at ¶ 9(B) (emphasis in original). The Policy's notice provision is actually broader than this; but as the court recognized in *Cade I*, and as CIC acknowledged at trial the notice issue is limited to "whether the [plaintiff] insureds complied the ... [foregoing] provision, requiring timely notice of a *potential* claim." *See Cade I*, 307 F.Supp.2d at 447 (emphasis in original).[4]

## II. Summary of Arguments

To resolve this issue the court must decide "whether or not it was *reasonable* for plaintiffs to believe that granting of the preclusion order could potentially give rise to a legal malpractice claim, thus implicating their duty to timely notify CIC." *Id.* at 452 (emphasis added). Whether the plaintiff insureds had a "good faith belief in [their] nonliability[ ]" is a part of this inquiry. *See id.* (quoting *Genova v. Regal Marine Industries, Inc.*, 309 A.D.2d 733, 765 N.Y.S.2d 266, 267 (2003) (citations omitted)) (and other citations omitted). "The determination of when the duty to give notice accrues requires an objective evaluation to ascertain 'whether the circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim.'" *Mount*

---

**4.** The court previously held in *Cade I* that the "notice of an actual claim or suit" condition is not at issue here. *See Cade I*, 307 F.Supp.2d at 447.

*Vernon Fire Ins. Co. v. Abesol Realty Corp.,* 288 F.Supp.2d 302, 310–11 (E.D.N.Y.2003) (quoting *Sparacino v. Pawtucket Mut. Ins. Co.,* 50 F.3d 141, 143 (2nd Cir.1995) (other citations omitted)).

In its earlier summary judgment motion and again during the trial, CIC argued that the "events of October 1998," *i.e.* "the confluence of an adverse verdict and a pivotal preclusion order stemming, in whole or in part, from the insureds' delay in serving an expert response, would have prompted a reasonable insured to give notice of a potential claim." CIC Trial Memo. at 9 and 10; *see also* CIC Summary Judgment Memo. at 6; and CIC Summary Judgment Reply at 5. CIC suggests another possible trigger date—a few months after October 1998 when supposedly Mr. Cade first became aware of the preclusion order.

Plaintiffs respond that the adverse verdict and the preclusion order did not amount to a "negligent act, error, [or] omission" within the meaning of ¶ IX(B) of the policy. *See* Pl. exh. 1 at ¶ IX(B). Hence, they were under no obligation to provide CIC with a notice of potential claim. Alternatively, even if they did commit legal malpractice, plaintiffs insist that they had no duty to inform CIC of a potential claim by the Nigros because under all of the circumstances it was reasonable for plaintiffs to believe that the Nigros were not going to sue them.

Plaintiffs rely upon several factors to support their position. They first note that C.P.L.R. § 3101(d)(1)(i), the statute under which plaintiffs moved to compel defendants to accept their expert disclosure on the morning of trial, is discretionary. In a similar vein they argue that the decision to change experts "was a strategic judgment which did not constitute malpractice[.]" Pl. Trial Memo. at 7. Plaintiffs also rely upon the close familial relation-

ship between Kyran and his aunt and uncle. Because of that relationship, Kyran never thought that the Nigros would sue plaintiffs. They further assert that "an expert is not required for a motor vehicle case, particularly where the defense does not utilize an expert[.]" *Id.* In addition, plaintiffs declare that "not every defense verdict is wrong[.]" *Id.* Furthermore, "the underlying liability was difficult given that plaintiff turned left accross [sic] three lanes of travel into defendant Moore's path[.]" *Id.* Finally, plaintiffs point out that "the Nigros continued to pay the disbursements ... after the verdict and appeal." *Id.* (citation omitted). For all of these reasons, plaintiffs contend that they are entitled to a defense and indemnification in the underlying malpractice action.

### III. Preclusion Order

As did CIC the court will focus first on the preclusion order, which is the primary event upon which CIC relies as purportedly triggering plaintiffs' obligation to provide a notice of potential claim. Objectively viewing the record facts known to plaintiffs upon the granting of the preclusion order shows that they were in an unenviable position. They were retained in a complicated personal injury case shortly before trial. Even that, coupled with the unavailability of their trial counsel, did not convince the trial court of the necessity of an adjournment. Hence, the court denied that motion.

The unavailability of the trial counsel was important because in all likelihood Kyran could not effectively represent his aunt and uncle given the extremely close nature of his relationship with them, about which he testified at some length. What is more, if plaintiffs had refused to represent the Nigros after denial of the adjournment, plaintiffs surely would have left themselves open for a claim that they act-

ed negligently because essentially they would be abandoning clients whom they had previously agreed to represent, leaving the Nigros to proceed to trial without counsel. Plaintiffs were effectively backed into a corner at that point. They had no choice but to proceed to trial with they hand they had been dealt—late retention in a complex case, unavailability of trial counsel and no adjournment to accommodate these factors.

Similarly, although not determinative here, plaintiffs' decision to retain Hagglund rather than stay with the DeGraff firm's chosen liability expert can be deemed a matter of professional judgment as to trial strategy. In the opinion of Cade and Kyran, seasoned litigators, Hagglund would have been far more effective before a jury than DeGraff's expert. Hagglund was a known "commodity" so to speak in that Cade & Kyran knew him and had confidence in his abilities because they had previously worked with him. The same was not true of DeGraff's expert. In fact, it may well have been that DeGraff's expert would have hurt the Nigros' case more than it would have helped it. This court declines to second-guess that judgment in choice of experts. The court is all the more hesitant to do so based upon the relatively scant record before it in terms of the merits of one expert over the other.

Turning to the disclosure issue in particular, it is undisputed that plaintiffs were unaware of the September 18th deadline to which attorneys Flink and Kunz agreed. *See* Pl. exh. 2 at 000057. Kyran testified that Kunz did not make him aware of that deadline; nor was there any indication in the DeGraff file of such a deadline. What is more, Kyran testified that he had never been advised of defendant's July 1995 demand for expert disclosure in the Nigro case. Plainly this demand was made more than three years before plaintiffs had any

involvement whatsoever with the Nigros. In the meantime, unaware of any court ordered deadlines, Kyran persevered in retaining Dr. Hagglund. In this situation, clearly the timing of plaintiffs' disclosure was not a matter of litigation strategy. Rather, the timing of plaintiffs' disclosure was out of necessity.

Plaintiffs' lack of knowledge as to any deadlines for expert disclosure is not the only basis for concluding that despite the granting of the preclusion order it was reasonable for them to believe that such order would *not* "suggest[ ] to a reasonable person the possibility of a claim." *See Mount Vernon Fire*, 288 F.Supp.2d at 310–11 (internal quotation marks and citations omitted). The fact, as discussed earlier, that § 3101(d)(1)(i) gives a court wide latitude in deciding when to allow late disclosure of an expert bolsters this conclusion. As Kyran later explained to CIC, and as he testified at some length during the trial, turning over such a response on the morning of trial "would not have been [his] M.O. had [the Firm] had this case from the beginning or even a few months before trial[.]" Pl. exh. 10 at 3. Kyran explained that he did not think plaintiffs "would be precluded as there was no scheduling order [of which he was aware] and no hard and fast rule in the Third Department with respect to timeliness of an expert disclosure." *Id.*

Kyran pointed out that "[i]n fact, the statute at that time was such that expert disclosure was premised upon reasonableness and stated that: 'where a party for good cause shown retains an expert an insufficient period of time before the commencement of trial to give appropriate notice thereof, the party shall not thereupon be precluded from introducing the expert's testimony at the trial solely on grounds of non-compliance with this paragraph. In that instance, upon motion of any party,

made before 'or at trial, or on its own initiative, the court may make whatever order may be just.' N.Y. C.P.L.R. § 3101(d)(1)(i)." *Id.* (emphasis added). Plaintiffs moved to compel defendant to accept their expert disclosure "at trial" as that statute allows.

Kyran opined that "[g]iven the fact that [the Cade firm] w[as] retained approximately a month before trial, and made diligent efforts immediately thereafter to retain an expert and provide disclosure," he "fully expected the Trial Court to make the appropriate order allowing expert testimony." *Id.* Similarly, Kyran testified that in serving the Nigros' expert disclosure response the morning of trial, he believed that the circumstances "fell squarely" within those which § 3101(d)(1)(i) contemplates. More specifically, Kyran reasoned that under the unique facts of this case, the morning of the trial was the "appropriate" time frame, within the meaning of the statute, for expert disclosure. *See* C.P.L.R. § 3101(d)(1)(i). This is a logical interpretation of § 3101(d)(1)(i), especially because that statute specifically provides that there shall not be preclusion "solely on grounds of non-compliance with [it]." *See id.*

CIC challenges plaintiffs' reliance upon the discretionary nature of this statute, going so far as to describe their reliance upon same as "foolhardy[.]" CIC Trial Memo. at 11. CIC contends that "because a trial court has the discretion to rule either way on a motion to preclude an expert witness, it was foolhardy indeed ... to serve the expert witness disclosure on the first day of trial." *Id.* (footnote omitted). The court disagrees. Given the discretion afforded courts under § 3101(d)(1)(i), combined with the other "circumstances known to the insured at the time[,]" *Mount Vernon Fire,* 288 F.Supp.2d at 310–311 (citations omitted),

such as the complexity of the Nigros' personal injury case; the fact that Mrs. Nigro had contacted Kyran practically on the eve of trial; and the efforts plaintiffs made to disclose Hagglund prior to the morning of trial, support the conclusion that plaintiffs had a good faith belief in their non-liability for legal malpractice. Indeed, all of the circumstances outlined above not only excuse plaintiffs' supposed delay in notifying CIC of a potential claim, but they can also be deemed mitigating circumstances. *See DiGuglielmo v. Travelers Property Casualty,* 6 A.D.3d 344, 776 N.Y.S.2d 542 (1st Dep't 2004) (citation omitted). And, as such, these circumstances further support this good faith finding.

This conclusion does not change when the defense verdict also is taken into account. The preclusion order, even in combination with the verdict, would not have suggested to a reasonable attorney-insured the possibility of a legal malpractice claim. As attorneys know, especially litigators, it is nearly impossible to predict a jury verdict in any given case. There are simply too many variables. Here, because Mr. Nigro himself turned left across three lanes of traffic before being hit from behind by defendant Moore, as well as the nature of his injuries, a verdict in the Nigros' favor was anything but a foregone conclusion. *See* Pl. exh. 19 at 2 ("[T]he underlying *Nigro* action was a difficulty liability case.... Thus, insofar as the case was one of questionable liability, the jury's verdict does not demonstrate negligence on the part of counsel.")

As with Sunday National Football League games, it is all too easy to engage in Monday morning quarterbacking after a trial. Attorneys do it all the time, whether or not there is a verdict in their favor. The court must confine its analysis to the relevant legal standard, however, which is the " 'whether *the circumstances known to the*

*insured at the time* would have suggested to a reasonable person the possibility of a claim.'" *Mount Vernon Fire,* 288 F.Supp.2d at 310–311 (quoting *Sparacino v. Pawtucket Mut. Ins. Co.,* 50 F.3d 141, 143 (2d Cir.1995) (other citations omitted)) (emphasis added). Limiting its factual review to the time of the granting of the preclusion order, followed by the defense verdict, persuades the court that plaintiffs *have* met their burden of proving a "good faith belief in nonliability[.]" *See id.* at 311 (citations omitted). As an aside, the court observes that while not dispositive, the close relationship between Kyran and the Nigros reinforce this finding of a good faith believe in nonliability.

To summarize, for the reasons set forth above, the court finds that plaintiff Cade & Saunders, P.C. has shown "a good-faith belief ... that [the] incident [the preclusion order and/or the defense verdiict] d[id] not trigger coverage under its insurance policy[.]" *See Cade I,* 307 F.Supp.2d at 452 (internal quotations and citations omitted). At the same time, the court hastens to add that a good faith belief in nonliability is not the same thing as an ultimate finding of no legal malpractice liability. That is an issue for another day and another court. Here, the good faith belief in nonliability only means that the Cade firm is excused from notifying CIC of a potential notice of claim, which in turn means that CIC cannot, as it has, deny coverage on that basis.

To this point the court has focused almost exclusively on the Cade firm. It will now briefly address whether plaintiff attorney Cade also had a good faith belief in his nonliability. The court need not become mired down in this issue. There was some suggestion by plaintiffs that Cade "was not personally involved in retaining the expert or the preclusion of his testimony[,]" and as such he is entitled to rely

upon the waiver of notice exclusion and breach of conditions set forth in paragraph IX(C) of the policy. *See* Pl. exh. 19 at 3. That exclusion has no bearing here though because to take advantage of it an insured such as Mr. Cade must first satisfy either paragraph IX(C)(1) or paragraph IX(C)(2), which he cannot do. As CIC accurately points out, "this provision only applies where the default in giving notice is 'solely because of the default or concealment of such default by one or more partners or employees responsible for the loss or damage otherwise insured hereunder.'" CIC Trial Memo. at 17 (quoting ¶ IX(C)(2)). There is absolutely nothing in the record to support such a finding.

Even though Mr. Cade cannot rely upon that policy exclusion, he, like the firm, had a good faith belief in his non-liability for any legal malpractice action by the Nigros. In fact, arguably his belief was even stronger given his almost complete lack of involvement with the Nigros' case, as the record amply demonstrates. He had nothing to do with the preclusion order. He was not even aware of it until "months and months later," although he was not sure of the exact date. As the record also makes abundantly clear, Cade had nothing whatsoever to do with the trial. He could not have; he had other professional commitments. Accordingly, the court finds that Cade also had a good faith belief in nonliability, which "excuse[s] [his] seeming failure to give timely notice[ ]" of a potential claim. *See Cade I,* 307 F.Supp.2d at 447 (internal quotation marks and citations omitted).

In conclusion, the court hereby grants judgment in favor of the plaintiffs, Cade & Saunders, P.C. and William J. Cade Esq. and declares that defendant Chicago Insurance Company is obligated to defend and indemnify these plaintiffs in the action commenced by the Nigros against plain-

tiffs, which is currently pending in the Supreme Court of Albany County, index number 6369–01. The court further declares that Chicago Insurance Company has an obligation to indemnify and pay any judgment rendered against plaintiffs, the Cade firm and Mr. Cade, in favor of the Nigros, to the extent of the policy limits under policy number LWB–3001455–0 issued by Chicago Insurance Company. Further, the court hereby DENIES judgment in favor of the defendant Chicago Insurance Company. The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.